ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Huffman Construction, LLC | ) | ASBCA Nos. 62591, 62783 |
| | ) | |
| Under Contract No. W912EQ-14-C-0028 | ) | |

APPEARANCES FOR THE APPELLANT:     S. Leo Arnold, Esq.
                                   Matthew W. Willis, Esq.
                                     Ashley & Arnold
                                     Poplar, MO

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
                                     Engineer Chief Trial Attorney
                                   Edward J. McNaughton, Esq.
                                   Ann M. Bruck, Esq.
                                     Trial Attorneys
                                     U.S. Army Engineer District, Memphis

OPINION BY ADMINISTRATIVE JUDGE CLARKE ON MOTION FOR PARTIAL
DISMISSAL FOR LACK OF JURISDICTION

The Army Corps of Engineers (COE), Memphis District, contests the Board's jurisdiction to adjudicate issues contained in paragraphs 31, 32, 33, 35, 36, and 37 of Huffman Construction, LLC's (Huffman) complaint. Huffman contends that these paragraphs rely on the same operative facts as are stated in its claim and are within the Board's jurisdiction. Huffman filed a protective claim embodying these six paragraphs that has yet to be decided by the contracting officer (CO). We possess jurisdiction to decide this motion pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. After a side-by-side comparison it is apparent that the facts in the six paragraphs are supported by the "operative facts" in Huffman's claim. The new legal theory of "change" is likewise supported by the "operative facts" of the claim. We deny the AF's motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

Since this is a decision on jurisdiction, we need not spend much time developing facts other than a brief introduction to the contract. We rely on the COE's background facts because Huffman did not dispute them in its opposition.

1. The COE awarded Contract No. W912EQ-14-C-0028 to Huffman on September 15, 2014, with a contract duration of 1230 days and February 27, 2018,

completion date.  (R4, tab 3 at 87)  The contract required Huffman to complete construction of the Grand Prairie Pump Station Superstructure, located near DeValls Bluff, Arkansas.  (R4, tab 3 at 1, 4-6)  Subsequent modifications extended the contract by 656 days with a December 15, 2019 final contract completion date.  (R4, tabs 7-8)  Once completed, the operating pump station would serve farming operations in eastern Arkansas and supply the water for the regionally strategic Grand Prairie irrigation and ground water preservation project.

2.  The COE issued the Notice to Proceed on October 16, 2014.  (R4, tab 13)

3.  The contract required Huffman to install and make operable six previously purchased pumps and motors as Government furnished equipment (GFE). (R4, Tab 3 at 1136-39)

4.  The contract required Huffman to install and level the pump support plates and pump assemblies to a maximum tolerance of 0.002 inch per foot in all directions (R4, tab 5 at 0009, 0012).

5.  The CO issued a Notice of Termination for Default, Serial Letter No. C-0126, on March 31, 2020.  (R4, tab 55)

6.  Huffman submitted a certified claim on June 25, 2020.  (R4, tab 60)  Huffman requested a time extension of 182 days and a price adjustment of $620,787.39. (*id.* at 4)  In its claim, Huffman asserts:  "But for the fabrication errors in the Government furnished property and the leveling issues with the pumps, all work would have been substantially complete by December 15, 2020."  (*Id.*)

7.  Huffman appealed the March 31, 2020 Notice of Termination for Default on June 26, 2020, 87 days after it was issued.  (R4, tab 61)  On July 1, 2020, the Armed Services Board of Contract Appeals docketed the appeal as ASBCA No. 62591.  The government denied Huffman's June 25, 2020 claim on October 27, 2020, and Huffman appealed that decision on January 11, 2021.  We docketed that appeal as ASBCA No. 62783.  The appeals are consolidated and the complaint submitted by Huffman is a consolidated one, applying to both appeals.

8.  On February 19, 2021, Huffman filed its complaint citing ASBCA Nos. 62591 and 62783.

9.  On April 30, 2021 the COE filed its "Partial Motion to Dismiss"[1] for lack of jurisdiction challenging paragraphs 31, 32, 33, 35, 36, and 37 of Huffman's complaint.

---

[1] More accurately stated it is a "motion for partial dismissal."

<u>DECISION</u>

*No Affirmative Defenses*

The COE refers to "affirmative defense" in its motion and reply. We recently discussed affirmative defenses in *Lockheed Martin Aeronautics Co.,* ASBCA No. 62209, 2021 WL 2912095:

> *2. Affirmative Defenses to a Claim*
>
> "Affirmative defenses" can protect a defending party from the consequences of its actions, even if everything alleged in the claim is true. This remedy is grounded in the notion that equity should be available to avoid suit or ensure a fair result to the one against whom the action was brought, even if the law might otherwise dictate a different result.

2021 WL 2912095 (footnote omitted)

In plain language, an affirmative defense seeks "avoidance" which is dismissal without reaching the merits, i.e., "avoiding" the merits. Rule 8 of the Federal Rules of Procedure lists affirmative defenses:

> Rule 8. General Rules of Pleading
>
> , , , ,
> (c) Affirmative Defenses.
>
> (1) *In General.* In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including:
>
> - accord and satisfaction;
> - arbitration and award;
> - assumption of risk;
> - contributory negligence;
> - duress;
> - estoppel;
> - failure of consideration;
> - fraud;
> - illegality;
> - injury by fellow servant;
> - laches;

3

- license;
- payment;
- release;
- res judicata;
- statute of frauds;
- statute of limitations; and
- waiver.

Huffman does not assert any of these affirmative defenses. We have no idea why the COE refers to affirmative defenses but we see no affirmative defenses for the Board to deal with.

*Legal Standard*

When addressing an allegation that an appellant introduced a new claim in its complaint we look to see if the new language in the complaint is based on the same "operative facts" as in the claim, "Both parties correctly recognize that whether the complaint asserts a new claim or not depends, in part, on if it relies on the same 'operative facts' cited in the claim." *Lee's Ford Dock, Inc.*, ASBCA No. 59041, 14- 1 BCA ¶ 35,679 at 174,638. If a new legal theory stated in a complaint is based on the claim's operative facts the new theory in not a new claim. *Alfajer, Ltd.*, ASBCA No. 62125, 20-1 BCA ¶ 37,660 at 182,858-59. If the new language in the complaint relies upon separate operative facts it will be treated as a separate claim. *Gov't Bus. Servs. Grp., LLC*, ASBCA No. 53920, 03-1 BCA ¶ 32,202 at 159,171.

*Operative Facts in Huffman's Claim*

We carefully reviewed Huffman's June 25, 2020 claim and identified the following operative facts asserted by Huffman:

Pumps and Motors Maintenance. The COE provided pumps and motors as Government Furnished Property (GFP). Huffman initially encountered problems trying to rotate the motors. During eight years of storage the government failed to properly rotate the pumps and motors every 30 days and otherwise provide proper maintenance. The contract required Huffman to hire manufacturer's representatives to oversee installation and testing of GFP. As a result the manufacturer's representative "strongly" recommended that the pumps and motors be inspected and repaired "as recommended by the equipment manufacturer." The CO refused. (R4, tab 60 at 1-2)

Levelness of Pumps. A fabrication error in GFE pumps caused a "levelness" problem. The pump manufacturer's representative determined it was not Huffman's

fault.  The CO failed to comply with the pump manufacturer's representative's recommendations.  (R4, tab 60 at 2)

Change in Electric Motors.  The original design called for Xylem (formerly ITT Industries Custom Pump) pumps and motors.  Before award the COE changed from Xylem to Ideal Electric motors that were significantly heavier increasing static load on the foundation and support floor.  No changes were made to the pump station to accommodate the additional weight.  The adaptor plate had changed the alignment and clearances.  This caused delay in installation and "may" have contributed to the leveling problems.  (R4, tab 60 at 4)

Network Analysis System (NAS).  COE misinterpreted NAS critical delays. With respect to levelness problems, the delay was on the critical path yet the COE failed to issue a change order extending the contract for the levelness problem.  With respect to GFP, the delay was on the critical path yet the COE failed to issue a change order extending the contract.  Also, the COE improperly interpreted NAS by not including the non-critical work with critical work delays.  The COE acknowledged Huffman was "likely entitled" to a critical delay in pump and motor installation, it claimed that the non-critical work would not be entitled to the same delay as the critical work.  Huffman contends the non-critical work was entitled to the same delay as the critical work.  (R4, tab 60 at 3)

Correspondence.  Huffman alleges the COE's failure to timely respond to its correspondence caused delays.  (R4, tab 60 at 3)

Record High River Stages.  Resolved by bilateral modification granting 334 days delay for a completion date of December 15, 2019.  (R4, tab 60 at 2)

*The Six Challenged Paragraphs in the Complaint*

Paragraph 31 reads:

> 31.    The contract required Huffman to install Government furnished pumps and motors. In this connection, Huffman was required by the Government to employ representatives of the manufacturers of the equipment, and to proceed under their inspection and guidance. At the time of bidding, Huffman was not aware that the Government furnished equipment had been improperly stored by the Government for ten years. Upon learning of the improper storage, both factory representatives strongly recommended that the equipment be sent back to their respective factories for disassembly,

5

inspection and replacement of various components. The Contracting Officer's refusal to comply with these recommendations was unreasonable and constitutes a contract change.

Paragraph 31 restates facts that are the same as stated in the claim. See "Pumps and Motors Maintenance" above. The common facts are that the pumps and motors were improperly maintained during storage and the factory representatives recommended the pumps and motors be inspected and repaired. The CO did not follow that advice. The COE asserts that each paragraph includes a new theory of recovery – a change.[2] A new legal theory asserted in a complaint but based of existing operative facts is not a new claim.[3] *Alfajer*, 20-1 BCA ¶ 37,660 at 182,858-59. The change theory is supported by the operative facts in the claim. Paragraph 31 does not present a new claim.

Paragraph 32 reads:

> The specifications (paragraph 3.3.1 of Section 11 20 00.00), represented that each complete unit of metal work and equipment furnished by the Government (i.e., the pumps and motors), had been completely assembled in the shop by the Government to determine that all parts fit accurately and functioned properly. After shop assembly and tests, units would be match-marked and disassembled only to the extent necessary for handling and shipping. It is obvious that no one had ever assembled the equipment to determine that all parts fit accurately and functioned properly. Compatibility problems between the Ideal Electric Motors and the Xylem pumps would have been discovered had the shop assembly ever occurred. Also, fabrication issues with the Government furnished pumps should have been discovered so that even levelness issues may have been avoided. The failure of the Government to comply with this requirement constitutes a contract change.

We do not read Huffman's complaint to allege entitlement based on the COE's failure to preform shop assembly or match marking and disassembly for shipping but we see that these factual allegations relate to "compatibility problems" between the

---

[2] Reference to use of the changes clause is in the claim. (R4, tab 60 at 2)

[3] A change theory is repeated in each of the six paragraphs but we will not repeat the fact that they are not new claims.

Ideal Electric Motors and Xylem pumps that is in <u>Change in Electric Motors</u> and levelness which is in <u>Levelness of Pumps</u>. That is enough, in our estimation, to connect the operative facts in the claim and paragraph 32. Paragraph 32 does not present a new claim.

Paragraph 33 reads:

> 33. Each critical item of work related to the pumps was performed under the guidance and inspection of the pump manufacturer's representative. Xylem's representative checked and verified the levelness of the pump soleplates before they were grouted. Xylem's representative also witnessed the grouting of the soleplates and verified that they remained square and level. The Xylem representative issued contemporaneous field reports verifying the levelness of the soleplates. The Government's refusal to accept the findings made by Xylem's representative was unreasonable and constitutes a contract change.

Paragraph 33 relates to the levelness of mounting plates (soleplates) for Xylem pumps as verified by the Xylem representative. As such paragraph 33 is directly related to <u>Levelness of Pumps</u> in the original claim. Paragraph 33 does not present a new claim.

Paragraph 35 reads:

> 35. The Government refused to provide reasonable directives to Huffman. The Contracting Officer would not direct Huffman to comply with Xylem's recommendation to send the pumps to Xylem's factory to correct the fabrication problems. The Contracting Officer would also not direct Huffman to proceed with installation of the pumps and motors without complying with Xylem's recommendations. The failure to give reasonable direction constitutes a contract change.

Paragraph 35 relates to Huffman's desire to comply with the pump manufacturer's representative's recommendation to return the pumps to Xylem for correction of fabrication problems. As such paragraph 35 is directly related to <u>Pumps and Motors Maintenance</u> in the original claim. Paragraph 35 does not present a new claim.

Paragraph 36 reads:

> The Government furnished pumps from Xylem were not compatible with the Government furnished motors from Ideal Electric. Originally, both the motors and pumps were to be manufactured by Xylem. However, under a prior contract, the Xylem motors were dropped in lieu of Ideal Electric motors. When Huffman received installation instructions from the Government after contract award, the instructions were still based on motors manufactured by Xylem rather than the much larger and heavier motors manufactured by Ideal Electric. The incompatibility of the Xylem pumps with the Ideal Electric pumps created problems with alignment and contributed to levelness issues. This lack of compatibility is a design defect and constitutes a contract change.

Paragraph 36 relates to the change from Xylem motors to Ideal Electric motors and resulting increase in weight. As such paragraph 36 is directly related to <u>Change in Electric Motors</u> in the original claim. Paragraph 36 does not present a new claim.

Paragraph 37 reads:

> In addition to fabrication defects in the Government furnished pumps which caused them to be out of tolerance for levelness, the design of the substructure/foundation was not adequate to avoid deflection and maintain the levelness tolerance of only 0.002 inches per foot. The pumps were level when first installed, and it is only after the motors are installed that levelness is not maintained within 0.002 inches per foot. This is a design defect which caused or contributed to the levelness issues encountered by Huffman, and constitutes a contract change.

Paragraph 37 relates to the change from Xylem motors to Ideal Electric motors, resulting in an increase in weight that caused the out-of-tolerance levelness problem. As such paragraph 37 is directly related to the <u>Change in Electric Motors</u> and <u>Levelness of Pumps</u> in the original claim. Paragraph 37 does not present a new claim.

To summarize, these six paragraphs each track with the operative facts in Huffman's claim and do not constitute new claims. Likewise, the new theory of change in each paragraph is supported by Huffman's claim's operative facts and are not new claims.

8

*The Termination for Default*

Let's not forget the termination for default. This appeal involves both a contractor claim (money and delay) and a government claim (termination). The COE has the burden of proof on the termination. In any event, although we need not address the matter here because we are satisfied that Huffman's claim embraced all matters in its complaint, we note that, even if it had not, subject to those limitations expressed by the Federal Circuit in *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010), and its progeny, a contractor may certainly challenge a termination for default based upon facts not included in the government's claim (to wit, the COFD).

CONCLUSION

In accordance with the above, the AF's motion is denied.

Dated: August 5, 2021

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

9

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62591, 62783, Appeals of Huffman Construction, LLC, rendered in conformance with the Board's Charter.

Dated:  August 5, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals